**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
SOUTHWESTERN DIVISION**

| | | |
|---|---|---|
| James Norman, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **ORDER RE CROSS MOTIONS** |
| vs. | ) | **FOR SUMMARY JUDGMENT** |
| | ) | |
| Dan Wrolstad, et. al., | ) | |
| | ) | Case No. 1:06-cv-010 |
| Defendants. | ) | |

Plaintiff James Norman is an inmate at the North Dakota State Penitentiary ("NDSP"). Norman was assaulted by inmate Michael Meyers on September 22, 2005.  As a result of the assault, Norman suffered bruises and contusions to the face and a broken nose.  NDSP officials disciplined Meyers.  They also referred the matter for felony prosecution, but the state's attorney declined to prosecute citing, among other things, the fact Meyers had been administratively disciplined.

In this action, Norman is suing a number of NDSP officials for violations of the Eighth and Fourteenth Amendments for disclosing confidential information he claims led to the assault, for allowing Meyers out in the general population, and for otherwise failing to protect him.  Norman seeks both compensatory and punitive damages.  He also has demanded a jury trial.

The defendants and Norman have filed cross-motions for summary judgment along with voluminous supporting documents and affidavits.  On January 16, 2008, the court conducted a telephonic hearing to resolve several pending discovery motions and also to discuss several questions the court had about the record.  Based on the court's order following the telephonic

hearing, additional documents were filed that the court has considered in resolving the pending motions.

For the reasons set forth below, Norman's motion for summary judgment is denied and the defendants' motion for summary judgment is granted in part and denied in part. In certain instances, fictitious names are used in referring to other prisoners to protect their identity.

## I.    BACKGROUND

### Early 1995 to approximately two weeks prior to the assault

According to Norman, the relevant events leading up to the September 2005 assault began in early 2005 with his filing administrative complaints against defendant Dan Wrolstad, the NDSP's Director of Education. The initial kites (prisoner complaints and requests for information are referred to as "kites" in prison parlance) had to do with the operation of a restaurant management class that was being offered in Wrolstad's Education Department. In the kites, Norman charged that the class was being operated illegally, including the unlawful use of prison funds to support the program. Norman urged that Wrolstad be fired for the claimed illegalities and for overall mismanagement of the NDSP Education Department. What is not clear from the record is what Norman's personal interest was in the operation of the restaurant class, much less his standing as a prisoner to complain about it.

On March 7, 2005, Norman sent a kite to defendant Warden Schuetzle claiming that Wrolstad was allowing other inmates to read the kites he was making regarding the operation of the restaurant class and that this was a serious security concern. Schuetzle responded the next day stating: "Mr. Wrolstad should not show your kites to other inmates, but he does have to research & respond to your questions."

After the passage of several months during which Norman continued to send kites complaining about the restaurant management class and defendant Wrolstad, Norman sent a kite to defendant Corky Stromme, NDSP's Chief of Security dated June 28, 2005, which also has an addendum dated June 30, 2005.  In the June 28 kite, Norman complained that Wrolstad was continuing to show his kites to other inmates and that Wrolstad was doing it purposely so that the inmates would retaliate against him.  The following is the complete text of the kite:

TO:     CORKY STROMME, CHIEF OF SECURITY

TOTAL CONFIDENTIAL

6/28/05

RE:     MR. DAN WROLSTAD-----CONFIDENTIAL

I am again coming to you concerning Mr. Dan Wrolstad photocopying my letters to him concerning issues with the Restaurant Management Class, and giving them to another inmate to run around the institution showing other inmates what I have wrote Mr. Wrolstad with issues concerning the operations of the Restaurant Management Class.  This is a "Serious Breach of Security", and also against the law.

Mr. Stromme, Mr. Wrolstad is "purposely" passing out my Confidential material to other inmates, in hopes that he will create a situation that some inmate will do his dirty work and cause a altercation, in hopes that I will stop asking and pointing out all of Mr. Wrolstad's lies and misleading statements concerning the restaurant management class.

Mr. Stromme, this is the 3rd time Mr. Wrolstad has done this with my Confidential Material, that I have found out about.  I have brought this issue to you once before, and also to Mr. Schuetzle once before.  (kite 3/7/05)  Mr. Wrolstad has been at this prison for many years, and is suppose to be a professional.  These actions by Wrolstad are not acceptable anymore.  I am asking for Mr. Wrolstad's termination.  Just because Mr. Wrolstad is a State employee and has been here for a long time, does not excuse him, or give him the right to purposely try to create a altercation.

Mr. Stromme, this matter is being brought to you in TOTAL CONFIDENCE.  Meaning this letter "is not" to be given to Mr. Wrolstad in any manner.  The inmate that told me about this matter, and also witnessed this photocopy is . . . [inmate " Doe" - a fictitious name]].  [" Doe"] . . . stated that he would be a witness in this matter.  But I would again, point out, this also needs to be kept in TOTAL CONFIDENCE.  I do not want . . . ["Doe"] to get into any type of altercation for standing up for me in the Illegal acts from Mr. Wrolstad.

Mr. Stromme, I will know if this CONFIDENTIAL letter to you is broken if I hear about it through the inmate population.  And that leak would come only from Mr. Wrolstad telling his special inmate.

Thank you

/s James Norman

(addition)

3

Today (6/30/05) another inmate told me Mr. Wrolstad talked to him, and Mr. Wrolstad told him that he needs to stay away from James Norman, and used the words, that he is going to get beat up. This inmate did not want his name mentioned. And I fully understand that. The point is, Mr. Wrolstad is soliciting for someone to beat me up. This is proven by Mr. Wrolstad again giving my letters to a inmate to pass around (3rd time), and then to tell another inmate that I'm to get beat up. Mr. Stromme, this is being told to you in again in <u>TOTAL CONFIDENCE</u>. Which means no else knows.

I would like to meet with you to discuss what is going to be done about Mr. Wrolstad. I'm asking for his job.

cc:    DEE MUND

(note)    This has nothing to do with inmates getting my paperwork, this is all Mr. Wrolstad. Any inmate would take paperwork given to them by a Staff member. It's Wrolstad's motive behind doing it. That's the issue.

(emphasis and errors appear in the original)

It is evident from the text of the June 28 kite that Norman's primary interest in pressing the "breach of security" issue was to use it as an additional reason why Wrolstad should be fired and not because he believed he was in any significant danger. Most telling is what Norman wrote in the addendum. After claiming that another prisoner had told him that Wrolstad had said Norman was going to get beat up, Norman concludes the paragraph by asking to meet with defendant Coad "to discuss what is going to be done about Mr. Wrolstad" because he was "asking for his job." Not once did Norman ask for an investigation as to who might be wanting to beat him up, much less make a request for protection. In fact, Norman did not even offer to disclose in private the name of the inmate who allegedly heard Wrolstad say that he (Norman) was going to get beat up.

There are at least two other things that confirm that Norman's real interest in pressing the "breach of security" issue in June and July of 2005 was to use it as a club against Wrolstad. The first is what Norman wrote in a series of kites immediately following his June 28 kite. The second is the fact that Norman actually possessed more information, which he claims now is relevant to his later assault, that he did not disclose, or offer to disclose in private, in his June 28 kite. The

significance of this requires some explanation and context.  Consequently,  the additional kites will be addressed first and then the information that Norman did not disclose.

Upon receiving Norman's June 28 kite, it appears that defendant Stromme turned the matter over to defendant Bob Coad, an NDSP Deputy Warden who was also Wrolstad's immediate supervisor.[1]  This is because, approximately a week later on July 11, 2005, Norman wrote another kite to Stromme inquiring about the status of  June 28 kite and  Stromme responded that the matter had been turned over to defendant Coad and that Norman could contact Coad or use the grievance procedure if he felt he was still having problems with Wrolstad.

After Norman received the response from Stromme, he wrote to defendant Coad on July 13, 2005, stating he would be waiting for Coad to talk to him about the matters set forth in the June 28 kite.   At the same time, Norman sent two other kites, both dated July 14, 2005.  The first was to defendant Stromme, with a copy to defendant LeAnn Bertsch, the Director of the North Dakota Department of Corrections, complaining about Stromme's refusal to deal personally with his "June 28 kite."  The kite to Stromme read as follows:

TO:     CORKY STROMME, COS

7/14/05

RE: RESPONSE TO KITE DATED 7/11/05

Are you not the Chief of Security here at the prison?  It amazes me how you are trying to wash you hands clean from all of what is going on in your expertise of Security & Orderly running of the prison here.
I have not only brought my issues to you twice now.  But now you don't want nothing to do with it.  Why is that?  Do my issues not concern the matters of Security & Orderly Running of the Institution?  Which is your area of expertise.
Then to top it all off with what has recently evolved in the Education dept., more than ever supports my issues again.  And yes, the administration is trying to cover all that up in the education

---

[1]   In an affidavit filed in support of his motion for summary judgment, Stromme states that, in addition to turning the matter over to Deputy Warden Coad for handling, he personally asked Wrolstad if the allegations were true and that Wrolstad denied the allegations.

dept. and Library, just to protect Mr. Dan Wrolstad and his corrupt little dept. he created.  Mr. Wrolstad is not qualified for his position.  It's time the prison stops feeling sorry for this man and fire him.

Mr. Stromme, this is another " Prime Example" of how loose this administration is running this prison.  No one wants to accept responsibility for their lack of professionalism.  And I hope this new Director, LeAnn Bertsch will clean up this administration and start holding the administrative staff accountable for their mismanagement of their dept. or area of so called expertise.  And I mean start firing staff.

Thank you.

/s JAMES NORMAN

cc: LeAnn Bertsch

The kite to Director Bertsch stated the following:

TO:     LEANN BERTSCH, DIRECTOR

7/14/05

RE:     SECURITY ISSUES

Ms. Bertsch,

I am sending you a copy of a letter I sent to Corky Stromme, "your" Chief of Security here at the prison.

This letter concerns the issue of Mr. Dan Wrolstad, Director of the Education dept., giving my Confidential letters to inmates to photocopy and pass around the institution to other inmates.  This is not the first time I have brought this issue to Mr. Stromme.  This is the second time to Mr. Stromme, and once before to Mr. Schuetzle.  And now Mr. Stromme does not want to deal with it.  This is his responsibility, and his position he was hired to do.  SECURITY.

Ms. Bertsch, I do not know if you know what has just recently happened in the Education Dept., but it also concerned Mr. Wrolstad allowing inmates to make copies of other inmates material and pass it around the institution.  And not to mention the other items that were discovered after that.  And then not hold anyone accountable.  This is a "Serious Issue" of mismanagement by Mr. Dan Wrolstad.  This man needs to be fired!  And you need to take a serious look into the investigation that is going on now in the Education Dept..  Mr. Dan Wrolstad needs to be held accountable for what he has not done.  Mr. Wrolstad is to blame for not doing his job in the fist place.  Mr. Wrolstad, is not qualified for the position of Director of Education.  He is not even licensed through the Education Standards & Practices Board.  Ms. Bertsch, you need to start cleaning up the mismanagement here at the prison.  The Buddy-Buddy System needs to go.
Thank you..

/s JAMES NORMAN

While Norman was in the process of sending the kites to Stromme and Bertsch, defendant

Coad gave Norman's June 28 kite to Wrolstad for his response despite Norman's request that it be

kept confidential. On July 15, 2005, Wrolstad responded in writing by sending Coad the following

memorandum:

<u>MEMORANDUM</u>

TO:          Robert Coad, Deputy Warden
FROM:        DAN WROLSTAD, DIRECTOR OF EDUCATION
DATE:        July 15, 2002
SUBJ:        James Norman's 6-28-05 letter

Here are the answers to his issues:

Photocopying his letters and showing it to other inmates:

This is a lie.  I have written him several times telling him he must send signed written statements from
inmates when he claims this stuff.  Again he has failed to do so.  In March when he wrote to Schuetzle
and claimed that I showed an inmate a copy of his request slip, I showed that I was on vacation in
Arizona when this happened which is documented in his file.

Soliciting to beat him up.

This is a lie.  I met with . . . [inmate " Olson" - a fictitious name] about a potential security problem
in the education building which indirectly dealt with Norman.  I did make the comment that "I am
surprised he runs with Norman" and that was it.  The discussion about Norman lasted 5 seconds.

I would hate to see anyone get into trouble concerning assaulting Norman.  I have told several inmates
that Norman is not worth losing your housing, job, being placed in AS and to simply ignore him.
Norman has had problems in the past and will probably have problems in the future with other inmates
because he simply gets into everyone's business and doesn't do his own time.

Since Norman doesn't want me to know about this, do what you feel is appropriate.

After Coad received Wrolstad's response, he provided a copy to Norman.  Norman then fired

off two additional kites dated July 15, 2005 to defendants Coad and Stromme, respectively.  The kite

to defendant Coad stated the following:

TO: Mr. Bob Coad, Deputy Warden

7/15/05

RE:      RESPONSE TO YOUR LACK OF INVESTIGATION INTO MY CONFIDENTIAL
         LETTER DATED 6/28/05

Mr. Coad,

        Apparently you or Mr. Stromme cannot read.  I stated numerous times in my letter to that the
letter is "Confidential", and not to be given to Mr. Wrolstad.  What part of that is confusing to
you?????

7

Mr. Coad, it amazes me how you claim to do an investigation into my complaint. You did not even talk with me in person. And I even sent you a kite requesting to meet with you. You did not even talk to the person I stated in my letter. Is this what you call a true and honest investigation?

Mr. Coad, how can you allow Mr. Wrolstad to sit and lie to you that I am lying about this matter. Look at just went down recently under Mr. Wrolstad's nose in his education dept., for which he is suppose to be the director. This time it was with another inmate. (MEANING) Mr. Wrolstad allowed inmates in his dept. to copy off another inmates personal paperwork, and give it to another inmate for which the paperwork was against. The only problem here is, the inmates got caught. And Mr. Wrolstad cannot lie and cover this recent mess up. Now tell me I'm lying about my confidential paperwork being copied and passed around. The problem is either Mr. Wrolstad is incompetent, or he is purposely allowing the inmates in his dept. to do this, because some inmate has stepped on Mr. Wrolstad's toe's for pointing out his incompetency to run the education dept.. But the facts point in my favor.

Mr. Coad, look at what all happened recently in the education dept.. (1) Inmates got caught copying another inmates personal paperwork and passing it around the institution. (2) Inmate got caught with Porn on a computer disc. (3) A inmate got caught with a CD burner (not allowed whatsoever) (4) Inmate got caught burning music on cds. (5) Inmate got caught making his own video games on computer disc. (6) And not to mention the lack of supervision and allowing inmates to run all over in the education dept. and staffs offices when staff are not there. And guess what? Nobody gets wrote up, Why is that? Is it because it would show and prove Mr. Wrolstad's incompetency in running the education dept.? And that is being covered up because of the embarrassment to the administrative staff for allowing this to happen.

Mr. Coad, I got my information from some of the inmates in the education dept.. So you can take that anyway you want to. But the bottom line is, Mr. Wrolstad is lying to you saying I am lying about my confidential paperwork getting into inmates hands in the education dept. for them to make copies, or, Mr. Wrolstad to make copies for them, to pass around the institution. The Facts prove in my favor without a doubt. Again, look at the recent event that just evolved in the education dept.. The problem is that they finally got caught. And Mr. Wrolstad cannot argue that.

Thank you.

/s JAMES NORMAN

The following is the kite that Norman sent to Stromme:

TO: MR. CORKY STROMME, COS

7/15/2005

RE:   <u>CONFIDENTIAL LETTER</u> SENT TO YOU CONCERNING MR. DAN WROLSTAD AGAIN
      ALLOWING INMATES TO PHOTOCOPY MY CONFIDENTIAL INFORMATION

Mr. Stromme,

I'm not going to get into your so called "expertise" as the Chief of Security here at the prison. But it is not very good. And I do not mean that to be sarcastic in any manner whatsoever. I have tried to deal with you in a professional manner. But it is clear that you do not take your job, or the problems going on in the prison under your watch very serious.

Here is the problem now. First off, "you" passed my confidential letter off to Mr. Bob Coad, Deputy Warden. In other words, "you" passed the buck instead of dealing with the issue of Security & Orderly Running of the Prison. "Your" job responsibility.

I wrote in my letter to you, numerous times, that this letter was to be kept confidential. And that I did not want Mr. Wrolstad to see it. <u>Now</u>, "you" handed my confidential letter to you, over to

8

Bob Coad.  Here's the problem with that.  Mr. Coad gave my letter to Mr. Wrolstad.  Without even discussing this matter with me at all.  <u>Mr. Stromme, neither you or Mr. Coad talked to me, or the person mentioned in my letter who witnessed my confidential letters to Mr. Wrolstad being passed around by inmates in the Education dept.</u>.  What a investigation you and Mr. Coad did again.  It's nothing but another cover up for Mr. Wrolstad and his lack of skills for his position.

Mr. Wrolstad's response is nothing but a pile of lies again to cover up his incompetency in his own dept.. Mr. Wrolstad mentions . . . . [inmate " Olson"] in his response.  This sound like guilt from Mr. Wrolstad, I never mentioned . . . [" Olson"] at all.  Then to top it off, Mr. Wrolstad uses the words, assaulting Mr. Norman.  And that he (Mr. Wrolstad) has told several inmates that Norman is not worth losing your housing, job, being placed in AS.  Now why would Mr. Wrolstad being saying this?  If someone is saying this to him, this sounds like a write up for that person.  Mr. Wrolstad is claiming that he has knowledge of someone wanting and planning to assault me.  Correct?

Now with some issues of Mr. Wrolstad and his incompetency, and lack of credibility with anything he says.  Who allowed inmates in the Education dept. to down load porn of the internet?  Meaning no staff supervision, and letting inmates hop right on the education staff's computers.  Which also means having access to staffs offices when no staff are around.  Who in the Education dept. allowed inmates to make copies of other inmates personal paperwork and pass it around the institution concerning Mr. . . . [inmate names deleted ] and the Russian inmates transferred from Oregon?  Who in the Education dept. allowed a inmate to sit around and make up their own video game programs.  Who in the Education dept. allowed inmates to burn music on to Cd's.  And the list can go on and on.  This is nothing but <u>MISMANAGEMENT</u> by Mr. Dan Wrolstad.  This man's credibility is gone.  This man is totally incompetent in his position.  Mr. Wrolstad has "no" Directorial skills for the position he claims he is, Director of Education.  This is a position given to him out of pity.

Mr. Stromme, the reason no inmate is getting wrote up in the education dept. with the recent security breaches, is because it exposes the incompetency of Mr. Wrolstad and the whole education staff here at the prison.  And it shows that you, yourself have not clue as to what security measures are needed in this dept..

Mr. Stromme, how can Mr. Wrolstad claim I am lying, when the "FACTS" that have just recently came out of his education dept. with inmates copying and passing out another inmates private paperwork?  And everyone knows this is true.  Look at the big shake down going on in the education dept. now because of this.  Look at all the inmates who no longer have the jobs they had.  What excuse does Mr. Wrolstad have for that?

Mr. Stromme, I am asking that you to do you job, instead of helping cover things up "again" for Mr. Dan Wrolstad.  Just look at all the security breaches he allowed to happen in his dept. recently.  These are serious issues.

Mr. Stromme, I have tried to deal with you in a professional manner.  But I guess a person needs to be a professional first.  Either you knew about all these current security breaches in the education dept., and ignored them.  Or now your to embarrassed to admit to them.   Which is it?  I thing you are to embarrassed, otherwise there would be quite a few write ups going out to inmates in the education dept.. And the reason there is no write ups is because it would expose the incompetency of Mr. Wrolstad and the rest of the administrative staff here at the prison.  Just look at all the security breaches in this last incident.  And then Mr.. Wrolstad claims I am lying.  Get Real.
Thank you.

/s JAMES NORMAN

(emphasis in original)

Finally, two days later, Norman sent an additional  kite to Warden Schuetzle dated July 17,

2005, that read as follows:

TO MR. TIM SCHUETZLE, WARDEN

7/17/05

RE: EMPLOYEE OF THE MONTH NOMINEE

Mr. Schuetzle,

I would like to nominate Mr. Dan Wrolstad for "Employee of the Month".  I make this nomination under the Superb Supervision Mr. Wrolstad has done in his dept..  I am talking about the most recent supervision skills where Mr. Wrolstad has allowed inmates under this supervision to go into staff's offices and use the internet without any staff supervision.  (Porn off the computer)  And the superb supervision to allow inmates to copy other inmates personal paperwork off the computers and pass the other inmates personal paperwork around the institution to other inmates to read.  Which endangered a inmate's life to the point he had to be put in protective custody.  And not to mention allowing a inmate to take items from the prison for their own personal gain, because Mr. Wrolstad doesn't know what is going on in his own dept., and did not even check on.  Mr. Wrolstad needs to be commended for allowing inmates to down load music, and play video games on the computers. Mr. Wrolstad  need to be commended for not handing out any write ups to his elite inmates who have done all of this behind his back with Mr. Wrolstad's "Superb Directorial & Superb Supervision Skills".  Mr. Wrolstad needs to be Honored for sitting on his butt and closing his eyes to everything that has unfolded again in his dept.  A pay check is a pay check.  This is truly a man of "Superb Skills" that need to acknowledge and brought to the media's attention so that the public can also recognize the Quality of Supervision and Security the prison has with Mr. Wrolstad.

Thank you.

/s JAMES NORMAN

cc: Governor, John Hoeven

What stands out in the series of kites to Stromme, Coad, Bertsch, and Schuetzle in July 2005, is the absence of any expression of serious concern by Norman for his personal safety, much less any request for protection.  This becomes even more significant given what Norman now acknowledges he knew and did not disclose.

In his June 28 kite, Norman named inmate " Doe" as a person who witnessed  his kites being passed around in one of the education classes.   After the September 2005 assault, "Doe" claimed in an affidavit prepared in connection with a grievance filed by Norman that he witnessed one of Norman's kites being reviewed and talked about in a computer education class by at least two other inmates.   The two inmates "Doe" named as being involved were inmate "Smith" (the fictitious

name of a black inmate and the significance of his being black will be apparent later), and inmate

Meyers, who later assaulted Norman.  "Doe" claimed that "Smith" and Meyers were reviewing

Norman's kite and discussing what should be done to Norman.  "Doe" stated, in pertinent part, the

following:

> ["Smith"] . . . handed me the grievance that was from James Norman, and sent to
> Dan Wrolstad.  I read it and asked where he . . . ["Smith"] got this grievance.
> ["Smith"] . . .  said, "from Wrolstad." ["Smith"] . . . and Mike Meyers was going
> over the grievance talking so everyone in the class knew what the grievance was all
> about.  The grievance form was in the class between 8:00am - 11:00am..  If you
> wish, I can have my wife make a photocopy of my journal page with the exact date
> and time, and how . . . ["Smith"] and Mike Meyers talked about the grievance and
> what should be done to James Norman.

He then went on to offer the following opinion:

> Also, if you go thru the kites and grievances of James Norman, you would find that
> Mr. Dan Wrolstad was the one to bring into play the assault Mike Meyers did to
> James Norman, thru . . . ["Smith"] and another inmate, which I will not mention due
> to security issues.

During the court's telephonic hearing on January 16, 2008, the court asked Norman about

what "Doe" had told him prior to sending the June 28 kite to Stromme since neither that kite nor the

subsequent kites to Stromme, Coad, Bertsch, and Schuetzle made any reference to inmates "Smith"

or Meyers, much less mention, without naming names, that there were two inmates who allegedly

were plotting to take retaliation against him.  In response, Norman acknowledged that "Doe" had

told him about Meyers and "Smith," along with their conversation about taking action against him.

Norman's explanation for why he did not disclose these details was because he expected that

someone would talk with either "Doe" or himself.

If Norman believed he was facing a "substantial" threat of harm at the time he was sending

the kites to Stromme, Coad, Bertsch, and Schuetzle, his explanation that he was waiting to be

11

contacted in person to provide the information he had not disclosed might make sense with respect to the initial kites - particularly if one of them had contained an expression of immediate concern for his safety along with a statement that he had additional information that he would provide in confidence, which none of the kites did.   However, Norman's explanation makes no sense with respect to his failure to address the matters in the subsequent kites if he truly believed he was in danger - particularly after he was given a copy of Wrolstad's response - since it had to be apparent by then that he would not be receiving a personal audience with respect to his complaints.

     In summary, during the time leading up to approximately two weeks prior to the assault, and construing the facts most favorably for Norman, no NDSP official, with the exception of possibly Wrolstad, had knowledge of a specific physical threat against Norman, much less knowledge that inmate Meyers or "Smith" may be plotting against Norman.   At most, the higher ranking NDSP officials were aware of Norman's *allegations* that Wrolstad was providing copies of Norman's kites to other prisoners, the fact that several  prisoners had expressed their displeasure with Norman, and several hearsay references about the possibility of Norman being beaten up.   While these matters may not have been investigated as thoroughly as they could  have been, they were not ignored. Wrolstad was asked to respond to the allegations, and Stromme and Coad were obviously satisfied with the response because a copy was provided to Norman.   Moreover, during this period Norman never once expressed concerns for his own safety nor did he ever ask for protection, rather his focus was upon his campaign to get Wrolstad fired.

### Information given to Officer Materi approximately two weeks prior to the assault

     Approximately two weeks prior to the September 22, 2005, assault upon Norman, inmate " Moe"  (a fictitious name) approached defendant Mary Materi, a NDSP Case Worker, to tell her

about a possible assault upon Norman.  There is a dispute over the details of what "Moe" told Materi and also over what she said and did in response.

Officer Materi states in an affidavit filed in support of the defendants' motion for summary judgment that an inmate (who she does not identify, but who clearly was "Moe") told her that a black inmate was going to assault Norman.   Materi claims she told the inmate (*i.e.*, "Moe") she would have to report the threat and, at that point, the inmate claimed he was not sure and that he wanted to check it out first.  Materi states that the inmate later advised her he was mistaken and that no one was planning to assault Norman.  Based on the record, it does not appear that Officer Materi logged this contact so that other NDSP officials would be aware that it had occurred.  Likewise, there is no evidence that she verbally passed the information on to other NDSP officials.

"Moe" disputes Materi's account, including particularly the part about his having recanted what he had told her.   In an affidavit that has been filed in this action, he claims the following:

> Approximately two weeks prior to James Norman being assaulted on 9/22/05, I was talking with Correctional Officer, Mary Materi.  I stated to Correctional Officer Materi, that there was a black guy looking to hire someone to beat up James Norman.  During this investigation, Mary Materi made the comment that she would put her money on Norman.  Shortly after talking with Mary Materi, I went and told James Norman the same information, and what Officer Mary Materi said about putting her money on Norman.
>
> I, . . . [inmate "Moe"], give this affidavit, because of false statements I have been informed about from Prison Staff member, Jean Sullivan.  Jean Sullivan stated that I informed Mary Materi that some black guy was going to assault Norman.  I did not say that.  What I said to Officer Materi was, that some black guy was looking to hire someone to beat up Norman.
>
> I was also informed that Jean Sullivan stated that I came back the next day and told Officer Materi that what I told her the day before wasn't true and if I heard anything else or if something changed, I would let her know.  I, . . . [ inmate "Moe"], never said such thing.  I did not come back the next day and tell Officer Materi that what I said the day before wasn't true and if I heard anything else or if something changed, I would let her know.  This is a false statement by Jean Sullivan.
>
> What I did, was tell May Materi that some black guy was looking to hire someone to beat up Norman.   Mary Materi stated she would put her money on

> Norman.  I informed James Norman of the same.  Mary Materi got mad at me for
> telling Norman this.  I did not come back the following day and tell Mary Materi
> what I told the day before wasn't true.  That statement is false by Jean Sullivan.

In an interrogatory, Materi was asked whether she had said to "Moe" words to the effect that "she
would put her money on Norman."  Materi's response was that she did not recall.

After "Moe" had talked to Materi, Norman claims "Moe" came to his cell and told him that
a black guy was looking to hire someone to beat him up.  Norman states that "Moe" advised him that
he had passed the information on to Materi and that Materi's response to "Moe" was that she would
put her money on Norman.  Norman claims that shortly after "Moe" had talked to him, Materi came
by his cell to let him out for work and that he confronted Materi about what "Moe" had said about
her putting her money on Norman.  Norman states that Materi was mad that " Moe" had shared this
information with Norman.

There is nothing in the affidavits or other documents filed with the court that Norman asked
at that point for protection or for a further investigation.  It may be that Norman assumed something
would be done given that the matter had been reported to Materi, but a jury might conclude it would
be out of  character for Norman not to have pressed the matter further if he believed he was in
imminent danger, particularly when immediate action was not forthcoming.

### The day prior to the assault and the logbook entry noting the possibility of an assault

On September 21, 2005, the day prior to the assault, a case worker from the West Cell
House, who has recently been identified as Brian Taylor and who is not a defendant in this action,
called defendant Marc Schwehr to advise him that inmate Meyers had made comments about
fighting Norman.  At the time, Schwehr was a case worker working in the East Cell House where
Norman was being housed.   Schwehr claims Taylor advised him he did not take Meyers seriously

because he believed he was only joking but that he had decided to pass on the information to be on the safe side. It is unclear whether Taylor notified anyone else. The discovery indicates that Taylor did not log what he heard Meyers say in the log for the West Cell House.

On the evening September 11, 2005, and presumably after the conversation with Taylor although the sequence of events is not entirely clear, Schwehr acknowledges that Meyers, who is an inmate barber, talked to him about letting Norman out of his cell for a haircut. There is evidence that this request was made under suspicious circumstances. Norman was on cell confinement for the evening and Schwehr understood that persons on cell confinement were not allowed out for a haircut, but Meyers attempted to convince him that the policy had changed. Also, around 7:00 p.m. a bag containing a towel was delivered to the East Cell House for Norman. The bag had been sent by Meyers. At this point, it is unclear whether this was part of the initial attempt to get Norman released for a "haircut" and prompted the conversation between Schwehr and Meyers, or whether it was an additional attempt to lure Norman out of his cell afterwards.

Schwehr states in his affidavit in support of his motion for summary judgment that:

> I did not know whether Meyers request was an attempt by Meyers to get Norman out of his cell so Meyers could give Norman a haircut, to talk to him, to buy something for him, or any number of other possible reasons.

Schwehr states the reason Norman was not let out of his cell that evening was because he was on cell confinement. While Schwehr professes not to know why Meyers wanted Norman out of his cell, he does indicate elsewhere in his affidavit that it was because of <u>both</u> the call from Taylor advising him about what Meyers said about fighting Norman <u>and</u> the "towel incident" that he notified his lieutenant about what had occurred and then entered into the logbook for the East Cell House a warning that Meyers may assault Norman.

15

At this point, there is no independent confirmation that Schwehr contacted his lieutenant - much less any evidence about what the lieutenant said in response, whether he gave any instructions to Schwehr, or whether he indicated he was going to take any action.[2]   There is evidence that Schwehr did make an entry in the log for East Cell House, however.[3]  The log, which was produced during discovery, contains the following entry: "**Meyers, Michael/ #2427 may assault Norman, James #16372, Lt. was notified**."  (emphasis added)  From the log, it appears this entry was made sometime between 7:00 p.m. and 8:15 p.m. on the evening of September 21, 2005.

Schwehr does not state in his affidavit whether he advised Norman of the possibility of an assault or the details of the information that had led up to his making the logbook entry.

Norman's account is somewhat different from Schwehr's.  Norman claims that, on the evening prior to the assault, Schwehr delivered the bag with the towel and asked Norman if he knew anything about the towel and that he replied he did not.  Norman then claims that Schwehr made the comment to him:  "It looks like someone is trying to set you up."  Schwehr acknowledges he made this statement to Norman, but states it was not until the day after the assault when things had became more clear to him.

Norman stated during the most recent telephonic hearing that Schwehr did not tell him where the towel had come from, did not tell him about Meyers wanting to get him out of his cell for a haircut, and did not tell him about the statements Meyers has made earlier in the day about assaulting him.  Norman also claims that Schwehr did not even warn him about the possibility of

---

[2] The defendants were required by one of the court's discovery orders to produce any written reference or note documenting a contact between Schwehr and the lieutenant and none was produced.

[3]  Norman claims that the log entry appears to have been altered.  What Norman claims are erasure marks appear to be nothing more than highlighting on the copy from which Norman's copy was made.  There is no credible evidence indicating that the log has been altered.

an assault without naming the potential attacker.  In terms of the towel being delivered and Schwehr's alleged comment that "it looks like someone is trying to set you up," Norman stated he understood the comment to suggest that someone was trying to get him in trouble for possessing property that he was not entitled to have and that he did not understand the comment to be that someone was trying to set him up for an assault.

Norman also claims that Schwehr stopped by his cell the day after the assault and they had the  following conversation:

> At this time Schwehr stated to me that it was inmate Meyers who was trying to get me out of my cell for a haircut.  Schwehr also stated that inmate Meyers was trying to tell him (Schwehr) that inmates on cell confinement could now get haircuts while on cell confinement, that someone filed a grievance on this matter.  Schwehr also stated to me, that he asked inmate Meyers if I even signed up for a haircut, and that inmate Meyers told him that I did.  Schwehr also stated to me, that Meyers was trying to get you in the Barber shop (inmate Meyers was a inmate barber).  Schwehr also stated to me, that it was inmate Meyers who gave the towels to the officer and was trying to get me to come out to get it.

**The assault**

On the day of the assault, Case Worker Materi reported for duty at approximately 5:30 a.m. As noted earlier, she is the officer who had been approached by inmate "Moe" approximately two weeks earlier about the possibility of an assault upon Norman, which she apparently dismissed.  On

17

the East Cell Block log, there appears, in part, the following entries for the morning of the assault:

> 5:30 AM - **Materi on Duty, Log Reviewed** - /s Materi
> . . . . [material omitted]   - /s Materi
>
> 6AM  - Breakfast rolled out, Showers running,
> Diabetics to infirmary  - /s Materi
>
> 6:20   10-33 - Across from law library, Traffic
> hallway.  **Meyers, Michael assaulted James
> Norman**.  Blood Spill Kits needed.   Call made
> by Officer Ronsberg  - /s Materi
>
> 6:40   10-33 Clear              /s Materi
>  note
> Breakfast running longer - med line running
> late.                    /s Materi

(emphasis added)  If Materi had reviewed the log from the prior evening, as the entry at 5:30 a.m. suggests she did, she would have been aware of Schwehr's entry regarding the possibility of an assault upon Norman by Meyers that had been made the night before.  This would have been in addition to what she had already been told two weeks earlier regarding a possible assault on Norman, which was information that only she possessed.

Materi claims in an affidavit filed in support of her motion for summary judgment that mornings are very hectic until the "roll-out" of prisoners, which starts at 6:00 a.m., is completed and that she routinely does not review the log from the night before until after "roll-out" takes place. She claims that on September 22, 2005, she did not review the log prior to the assault upon Norman, despite the log entry suggesting the contrary.

Later, on the day of the assault, an NDSP captain received a "kite" from yet another inmate that stated simply: "The Assault at 6:25 AM today, was a payed hit."

Norman was treated for a cut above his eye that required stitches, a broken nose, and a concussion. The records indicate that there was a significant spillage of blood on Norman's clothing and in the area where the assault took place. Norman also stated in the most recent telephonic hearing that his face was significantly swollen and that his eyes were blackened.

Norman claims that prison officials interfered with his ability to fully document his injuries by denying him access to a particular photographer. Pictures were taken, however, as part of the NDSP's investigation into the assault that show the injuries to Norman. The defendants are not disputing that the injury was sufficiently serious to raise Eighth Amendment concerns.

### Investigation conducted by the NDSP and Meyers's administrative conviction

Meyers was administratively charged with assaulting Norman. He admitted to the offense and was administratively disciplined. His punishment included 20 days disciplinary detention, loss of job, loss of south unit housing privileges, loss of one month good time, no accumulation of good time until re-employed, and payment of the medical costs from his prison spending account. In addition, NDSP officials referred the matter to the Burleigh County State's Attorney for felony prosecution. The state's attorney declined prosecution citing the administrative punishment as one of the reasons for the declination.

An investigation report prepared in connection with the disciplinary proceedings indicates that Meyers claimed he had not planned the assault. The defendants rely upon this statement as support for their argument that there was not a substantial threat of assault against Norman at the time it occurred that would have required action on their part because of the claimed spontaneity of the assault. Meyers's account, however, is open to question in view of the substantial evidence of his attempting to lure Norman out of his cell on the evening prior to the assault. Further, even

though Meyers claims that the assault was unplanned, he stated somewhat mysteriously that it "would have happened anyway" and that Norman "needs to stop (grievances)." Further, in a letter to his girlfriend shortly after the assault, he stated, in part:

> I can honestly say that this dude will no longer try to f**k with my time and his cho friends got the message as well.

From the records submitted to the court, there is no indication that NDSP staff followed up on the kite they received stating the assault was a "paid hit." In particular, there is no record of the inmate who sent the kite being interviewed.

### Meyers's disciplinary record

Meyers's disciplinary record indicates that he had five administrative convictions for assaulting other inmates in less than two years prior to the assault upon Norman - one of which was directed at an informant who Meyers believed was snitching on him.[4]  During one of the assaults, Meyers had to be forcibly subdued.  On another occasion, the SORT team had to forcibly extract Meyers from his cell in order to take him away to administrative segregation.

Prior to instituting this action, Norman filed an administrative complaint claiming that his civil rights had been violated and one of the things that he complained about was the fact that Meyers had been allowed out in the general population despite his prior record for assaultive behavior.  In response, Unit Manager defendant Jean Sullivan indicated that Meyers had been placed

---

[4]  The dates of the assaults are: 12/23/03 (2 separate incidents on that date); 6/23/04 (following which Meyers had to be forcibly removed from his cell); 7/23/04 (Meyers had to be forcibly subdued); and 12/25/04.  The forgoing information comes from material submitted to the court during the process of it attempting to resolve the discovery disputes regarding how much information would be provided to Norman that the NDSP claimed was confidential.  The court indicated it would draw all necessary inferences from Meyers's administrative record in Norman's favor upon summary judgment in terms of whether Norman should be considered a risk for committing future assaults by person with knowledge of Meyers's administrative record and then decide later how much of the information would be provided to Norman beyond a bare listing of Meyers's administrative convictions for assault.

in administrative segregation following the prior incidents of assault, but was released in February 2005 because he had demonstrated appropriate behavior and was involved in the Intensive Anger Management program.  She further noted that Meyers had earned his way into a preferred housing unit and had been demonstrating positive behavior prior to the assault on Norman.  Defendant Schuetzle also stated essentially the same thing in his affidavit filed in this action.

Norman claims, however, that Meyers was involved in another incident of assault after he had been released from administrative segregation and prior to the assault upon him.  Norman claims that Meyers purposefully cut a letter "C" in the back of another inmate's head while giving him a haircut to identify him as a child-molester (a "Cho").  In an affidavit filed in this action, the inmate confirms the incident and claims he filed a grievance with the prison administration and that the administration told him he should not have gone to Meyers for a haircut in the first place and took no action.  If true, it would be the sixth prior incident of assaultive behavior.  The defendants claim they have no written record of any such grievance or complaint.   Also, it is not clear exactly when this incident occurred but there is some evidence that it took place after Meyers's last stint in administrative segregation and during the time he was demonstrating his good behavior.

## II.    GOVERNING LAW

### A.    Summary judgment

The following well-established principles govern the court's consideration of the defendants' motion for summary judgment:

> Summary judgment is appropriate only when the pleadings, depositions and affidavits submitted by the parties indicate no genuine issue of material fact and show that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The party seeking summary judgment must first identify grounds demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Such a

> showing shifts to the non-movant the burden to go beyond the pleadings and present
> affirmative evidence showing that a genuine issue of material fact exists. <u>Anderson</u>
> <u>v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256-57, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202
> (1986). The non-moving party "must do more than simply show that there is some
> metaphysical doubt as to the material facts." <u>Matsushita Elec. Ind. Co.</u>, 475 U.S. 574,
> 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d (1986). The non-movant "must show there is
> sufficient evidence to support a jury verdict in [her] favor." <u>Nat'l Bank of Commerce</u>
> <u>v. Dow Chem. Co.</u>, 165 F.3d 602, 607 (8th Cir.1999). "Factual disputes that are
> irrelevant or unnecessary will not be counted," <u>Anderson</u>, 477 U.S. at 248, 106 S.Ct.
> 2505, and a mere scintilla of evidence supporting the nonmovant's position will not
> fulfill the non-movant's burden, <u>id.</u> at 252, 106 S.Ct. 2505.

<u>Uhiren v. Bristol-Meyers Squibb Company, Inc.</u>, 346 F.3d 824, 827 (8th Cir. 2003); <u>see</u> <u>also</u> <u>Scott</u>

<u>v. Harris</u>, __ U.S. __, 127 S.Ct. 1769, 1776 (2007).

## B.   Constitutional claims

### 1.   Eighth Amendment

The Eighth Amendment's prohibition against cruel and unusual punishment requires prison

officials to "take reasonable measures to guarantee" the safety of inmates and to protect them from

violence by other prisoners.  <u>Farmer v. Brennan</u>, 511 U.S. 825, 832 (1994); <u>Young v. Selk</u>, 508 F.3d

868, 871 (8th Cir. 2007).  This is because "[b]eing violently assaulted in prison is 'not part of the

penalty that criminal offenders pay for their offenses against society.'" <u>Farmer</u>, 511 U.S. at 834

(<u>quoting</u> <u>Rhodes v. Chapman</u>, 452 U.S. 337, 347 (1981)).

Not every assault upon an inmate gives rise to an Eighth Amendment violation, however.

Because the Eighth Amendment is limited to prohibiting punishment that is cruel and unusual,

prison officials violate the Eighth Amendment only when there is "'deliberate indifference'  to a

substantial risk of serious harm." <u>Farmer</u>, 511 U.S. at 828; <u>Young v. Selk</u>, <u>supra</u>,   In order to prove

an Eighth Amendment violation under this standard, a prisoner must satisfy both an objective and

subjective component.  First, the prisoner must show that the alleged constitutional deprivation was

"objectively, sufficiently serious."  This requires a showing that he or she was being "incarcerated under conditions posing a substantial risk of serious harm."  Farmer, 511 U.S. at 834; Young v. Selk, 508 F.3d at 872.

Second, the prisoner must show that each prison official sought to be held accountable had actual knowledge of the substantial risk and failed to respond to it.  Farmer, 511 U.S. at 834-845; Young v. Selk, 508 F.3d at 873.  The subjective state-of-mind that must be proved is an "actual intent that the inmate be harmed, or knowledge that harm will result, *or reckless disregard of a known excessive risk to inmate health and safety.*"  Krein v. Norris, 309 F.3d 487, 492 (8th Cir. 2002) (italics in original) (quoting Newman v. Holmes, 122 F.3d 650, 652 (8th Cir. 1997)).   When the claim is one of recklessness, proof of negligence is not enough, nor is proof of recklessness in the tort sense.  Farmer, 511 U.S. at 839-843.  Rather, the state of mind must be at least on par with criminal recklessness, *i.e.*, a conscious disregard of  a substantial risk of serious harm.  Id.  at 839.

Further, in evaluating both the objective and subjective components, the court must keep in mind that prisons house individuals who have not been able to conform to the rules and obligations of society and that "threats between inmates are common and do not, in every circumstance, serve to impute actual knowledge of a substantial risk of harm."  Blades v. Schuetzle, 302 F.3d 801, 804 (8th Cir. 2003) (internal quotes omitted).  The pertinent time to determine the "relevant prison official's knowledge [is] the time in question, not with hindsight's perfect vision."  Id. (quoting Jackson v. Everett, 140 F.3d 1149, 1152 (8th Cir. 1998)).

Finally, if prison officials have acted reasonably, they are free from liability under the Eighth Amendment even if they knew of the substantial risk of harm and the harm was not averted.

"Whether one puts it in terms of duty or deliberate indifference, prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishment Clause."  Farmer, 511 U.S. at 845.

In this case, Norman claims there were three ways in which one or more of the defendants were deliberately indifferent to his safety and violated the Eighth Amendment.  First, he claims that one or more of the defendants had knowledge of the potential for the  impending assault and failed to take reasonable action.  Second, he claims that one or more of the defendants had knowledge of Meyers's dangerous propensities and failed to take reasonable measures to protect Norman and other prisoners from assaults by Meyers.  Third, he claims that defendant Wrolstad deliberately released confidential information relating to Norman in hopes that one or more prisoners would take retaliation against Norman.  These claims will be addressed in more detail below with respect to the individual defendants.

### 2.     Fourteenth Amendment

Norman also alleges that the defendants violated his rights under the Fourteenth Amendment.  As already noted, the Eighth Amendment provides specific constitutional protection from prison officials placing prisoners at risk of harm.  Consequently, the Fourteenth Amendment is involved only to the extent that it incorporates the protections of the Eighth Amendment and makes them applicable to state actors.  This is because the Supreme Court has held that, when another amendment provides specific constitutional protection, there is no separate Fourteenth Amendment substantive due process claim.  See, e.g., County of Sacramento v. Lewis, 523 U.S. 833, 842-843 (1998).  In other words, Norman does not have an independent claim under the Fourteenth Amendment; his claims rise or fall under the Eighth Amendment.

### C.      Qualified immunity

"Qualified immunity protects government officials performing discretionary functions from liability for damages so long as 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  E.g., Curry v. Christ, 226 F.3d 974, 977 (8th Cir. 2000) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). "Qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" Berry v. Sherman, 365 F.3d  at 634 (quoting  Malley v. Briggs, 475 U.S. 335, 341 (1986)).

In resolving a claim of qualified immunity, the Supreme Court has recently reaffirmed that the courts are required to follow a two-step process:

> In resolving questions of qualified immunity, courts are required to resolve a "threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? This must be the initial inquiry." Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). If, and only if, the court finds a violation of a constitutional right, "the next, sequential step is to ask whether the right was clearly established ... in light of the specific context of the case." Ibid.

Scott v. Harris, 127 S.Ct. at 1774; see also Young v. Selk, 508 F.3d at 871, 874-875.

Finally, qualified immunity is not just a defense, it is an immunity from suit.  E.g., Saucier v. Katz, 533 U.S. at 200-201. Consequently, courts are instructed to resolve the claim of qualified immunity at the earliest opportunity since the immunity is effectively lost if the case proceeds to trial.  Id.

Nevertheless, while the issue of qualified immunity is a question of law for the court, the court must deny a request for summary judgment based upon a claim of qualified immunity when the facts construed most favorably for the plaintiff do not support the claim, e.g., Young v. Selk, supra,  or in the infrequent case when there are disputed issues of predicate fact that are material to

resolving the claim of qualified immunity at the summary judgment stage, <u>Littrell v. Franklin</u>, 388 F.3d 578, 584-586 (8th Cir.2004); <u>Krein v. Norris</u>, 309 F.3d at 493.

## III.   <u>DISCUSSION</u>

Each of the individually named defendants have moved for summary judgment claiming, first, that there is not sufficient evidence to establish a violation of the Eighth Amendment and, second, that they are entitled to qualified immunity.  Norman has cross-moved for summary judgment claiming that he is entitled to judgment as a matter of law for a violation of his civil rights.

The court will address the claims of constitutional violation and the defense of qualified immunity with respect to each of the named defendants.

### A.   **Defendants Branson, Jorgenson, and Sullivan**

There is nothing in the record which indicates that defendants Pat Branson, Brian Jorgenson, or Jean Sullivan had any personal involvement in the events leading up to the assault upon Norman. If they did, Norman has failed to demonstrate how they were involved, much less prove that they were deliberately indifferent to his safety.

It appears the reason why Branson and Sullivan have been named is because they were involved in the investigation and denial of the administrative civil rights claim that Norman filed after the assault.  Norman claims that Branson and Sullivan wrote false investigation reports, wrongly denied his grievance, and otherwise deliberately covered up the constitutional violations that Norman believes occurred. This after-the-fact involvement, however, does not give rise to an

Eighth Amendment violation related to the assault.[5]  In terms of Jorgenson, it is not clear why he was named.

Based on the record, defendants Branson, Jorgenson, and Sullivan are entitled to a summary judgment of dismissal on the grounds of qualified immunity and on the merits.

**B.    Defendants Materi and Schwehr**

**1.    Whether a "substantial risk of serious harm" existed on an objective basis**

Materi and Schwehr both claim that Norman was not subjected to a "substantial risk" of assault when considered on an objective basis. The court disagrees, particularly given the circumstances that existed the day prior to the assault.

Construing the facts most favorably for Norman:  Meyers, a person with a substantial prior history of assaulting other inmates, was overhead by a prison staff person making statements about assaulting Norman the day prior to the assault.  Then, the same evening, Meyers engaged in highly suspicious conduct that the jury could reasonably conclude amounted to a failed attempt to lure Norman out of his cell for the purposes of committing an assault.  Finally, a trained correctional officer, after arguably becoming aware of these facts, believed it necessary to make a log entry warning that inmate Meyers may assault Norman for the purpose, in his own words, "to protect Norman."  By any measure, there existed a "substantial risk of serious harm" on an objective basis.

---

[5]  The result of the initial screening conducted pursuant to 28 U.S.C. § 1915A was that Norman was allowed to proceed only with respect to claims under the Eighth and Fourteenth Amendments related to the assault.  But, even if the lawsuit had not been initially so constrained, Norman would have no claim against NDSP officials for what occurred thereafter because prisoners have no substantive constitutional interest in prison officials following state prison regulations, including prison grievance procedures.  See, e.g., Phillips v. Norris, 320 F.3d 844, 846-847 (8th Cir. 2003). If Norman's federal constitutional rights were violated with respect to the assault, he has this action to seek vindication.

To claim otherwise is to ascribe a degree of probability to the terms "substantial" and "risk" beyond that contemplated by the Supreme Court in <u>Farmer</u>.

When the Supreme Court used the phrase "substantial risk of serious harm" in <u>Farmer</u> to describe the Eighth Amendment's objective component, the Court cited to its decision a year earlier in <u>Helling v. McKinney</u>, 509 U.S. 25 (1993). <u>Farmer</u>, 551 U.S. at 834,  In <u>Helling</u>, a prisoner had sued prison officials under the Eighth Amendment for failing to protect him from secondhand smoke and prison officials had argued that the risk presented by secondhand smoke was simply too remote and speculative on an objective basis to be actionable.  The Supreme Court did not agree or disagree, rather it concluded that the prisoner should be allowed the opportunity to prove his case.  In reaching this decision, the Court made reference with seeming approval to other characterizations of the risk of harm that is protected by the Eighth Amendment that included: "sufficiently imminent dangers" and a "significant risk of proximate and substantial harm." <u>Id.</u> at 33-34.  Then, the Court described in some detail what the plaintiff in <u>Helling</u> would be required to prove upon remand and used the words "unreasonable risk" and "grave" to characterize the degree of risk that would meet the objective component. <u>Id.</u> at 35-36.

It is also worth noting that, a few months prior to deciding <u>Farmer</u>, the Supreme Court had the occasion to discuss the use of the word "substantial" in the somewhat analogous context of criminal jury instructions that use the term as part of the definition of "beyond a reasonable doubt." In that case, the Court relied upon the definition of the term "substantial" found in Webster's Third New International Dictionary as being "not seeming or imaginary" and that which is "specified to a large degree." <u>Victor v. Nebraska</u>, 511 U.S. 1 (1994) (<u>quoting</u> Webster's Third New International Dictionary, at 2280).

Based on the foregoing, there is no reason to believe that the Supreme Court intended by the use of the words "substantial risk" a degree or probability of risk greater than what common usage of that phrase would suggest.  If the Supreme Court had intended that the risk of serious harm must be a "virtual certainty" or other like formulation - which is essentially what the defendants are contending here - it would have said so and not used the word "substantial," which has its own well-understood meaning.

The Eighth Circuit has not construed <u>Farmer</u> as requiring a degree of risk beyond what is suggested by the words "substantial risk" in their ordinary sense given the language it has used to describe the risk, <u>e.g., Young v. Selk</u>, 508 F.3d at 871-874 ("substantial risk"); <u>Berry v. Sherman</u>, 365 F.3d  at 634 ("substantial or pervasive risk"); <u>Krein v. Norris</u>, 309 F.3d at 492 ("excessive risk"), or the fact patterns that the court has stated  would support a finding of substantial risk,  <u>e.g.</u>, <u>Young v. Selk</u>, 508 F.3d at 871-874; <u>Newman v. Holmes</u>, 122 F.3d at 652; <u>Erickson v. Holloway</u>, 77 F.3d 1078, 1080 (8th Cir. 1996); <u>Reece v. Groose</u>, 60 F.3d 487 (8th Cir. 1995).  In fact, the Eighth Circuit's pattern instructions for Eighth Amendment "failure to protect" cases that involve prior knowledge of a risk of a specific assault do not offer a further definition of "substantial risk."  The instructions merely tell the jury that it must find that a "substantial risk" existed.  8TH CIR. CIVIL JURY INSTR. §§ 4.32 & 4.44 (2007).

In summary, after construing the evidence most favorably for Norman, there existed a substantial risk of serious harm to Norman on an objective basis  beginning at least the day prior to the assault.  A reasonable jury could reach the same conclusion.

The issues with respect to defendants Materi and Schwehr that present closer questions are whether there is sufficient evidence from which a reasonable jury could find that they possessed the

requisite knowledge of the risk and were consciously indifferent to it.  Also, with respect to defendant Schwehr, there is the issue of whether the steps he took were objectively reasonable and a reason why he should not be held liable.  These points will be addressed separately with respect to each defendant along with their claims of qualified immunity.

### 2.     Defendant Schwehr

Schwehr claims he lacked "actual knowledge" of a substantial risk because he did not believe at the time that there was a "definitive" threat of an assault by Meyers because Meyers was not an inmate who could be taken seriously in that he was always joking around and because there are always rumors about other inmates, some of which involve fighting.   Schwehr claims he made his log entry based only a "hunch" and suggested in his affidavit that he would have taken "more extreme measures, such as placing Norman in Administrative Segregation to protect him, or locking down the prison" if the threat had been more definitive.

As already noted, the day prior to the assault Schwehr was advised by Brian Taylor, a case worker from the West Cell House, that Meyers had made statements about assaulting Norman although, according to Schwehr, Taylor believed that Meyers was probably joking.  Then, the same evening, Schwehr became aware of an attempt by Meyers to get Norman to come for a haircut and that Meyers had sent a bag containing a towel to Norman.

At this point, the only evidence that Taylor believed Norman was joking comes from defendant Schwehr.  Even if the jury concludes Schwehr is truthful on this point, there are disputed facts regarding what occurred the evening prior to the assault and what conclusions Schwehr drew from those facts.  For example, the jury could conclude that what had occurred the evening prior to the assault was a failed attempt on the part of Meyers to lure Norman out of his cell for the

purpose of assaulting him.  The jury could also conclude that Schwehr had in fact "connected the dots," based on what had been reported to him earlier about Meyers having talked about assaulting Norman and Meyers's attempts to get Norman out of his cell for a "haircut" under suspicious circumstances, and reached the same conclusion, despite his claims to the contrary.  Notably, Schwehr did not make the entry in the log until after the evening events had taken place when, arguably, Meyers's earlier words had translated into action in the form of a failed attempt to get Norman.  Also, Norman claims that Schwehr told him that evening that it appeared that someone was intending to set him up, which, if stated at that time, suggests something more than a hunch.  Finally, Schwehr's affidavit does not address, but the jury might find highly relevant, his knowledge of Meyers' prior record of assaultive behavior.

In this case, there is more than sufficient evidence from which a jury could conclude that Schwehr possessed the requisite knowledge of a substantial risk of serious harm to Norman.  In fact, even if the jury believed the underlying events occurred as Schwehr described them, they might disagree regarding his after-the-fact characterization of the seriousness of the risk.

Schwehr also argues that, because he took action, he should not be held liable. As already noted, a prison official has no liability under the Eighth Amendment if he took reasonable action, regardless of what his state of mind may have been.  <u>Farmer</u>, 511 U.S. at 845.

The fact that Schwehr took some action is not by itself enough to insulate him from liability, particularly at the summary judgment stage.  In order to grant summary judgment, the court must be able to conclude that the action taken was reasonable as a matter of law given the risk that existed after construing the evidence most favorably for the non-moving party.   If the court cannot reach this conclusion because a reasonable jury could conclude that the actions taken were not reasonably

sufficient, then summary judgment must be denied.  See Young v. Selk, 508 F.3d at 874 (evidence could support the conclusion that prison guards did not do enough when they advised a prisoner who had been threatened to file a kite because the process could take too long); Erickson v. Holloway, 77 F.3d at 1080 (jury could conclude that a guard who took some precautions acted unreasonably when he failed to disable a control panel when leaving his post and when he failed to investigate the sudden movement of the prisoner who had been identified as being a threat); Reece v. Groose, 60 F.3d at 691 (jury could conclude that the placement of the victim inmate in administrative segregation for his protection was not enough because a prisoner with a history of disciplinary problems was allowed access to the protected area).

In this case, the court cannot conclude as a matter of law that the actions taken by Schwehr were reasonable under the circumstances and that a jury could not find otherwise.  In his affidavit, Schwehr claims that the reason he did not take other, more affirmative action was because he did not believe there was a definitive threat.  Arguably, this suggests that other measures should have been taken if the jury concludes the threat was "definitive" using Schwehr's words.  As already observed, the jury could conclude that the risk was definitive given the recent report that Meyers had talked about assaulting Norman, even if he was believed to be only joking, when coupled with the events that occurred the evening prior to the assault, which the jury could conclude was a failed attempt to attack Norman.

Meyers's prior record of assaultive behavior and whether Schwehr had knowledge of that record may also have a bearing upon what was reasonable.  At this point, the record is sparse in terms of what Schwehr knew about Meyers, but, in his affidavit, he described Meyers's reputation as person not to be taken seriously.  From this, it can be inferred that Schwehr was familiar with

Meyers and, presumably, his reputation for assaultive conduct.  Also, Norman stated in the most recent court hearing that Meyers had a reputation in the institution for being a  "bully," which, if true, is evidence from which the jury may infer that Schwehr was also aware of this reputation.  If the jury concludes that Schwehr had knowledge of Meyers's prior record of assaultive behavior, it might conclude that more affirmative action was required to address the threat that existed, such as locking Meyers down, rather than simply making a log entry in the cell house log where Norman was housed and hoping that someone would then act to protect Norman.

Morever, this leads to another concern:  Schwehr stated in his affidavit that he made his log entry "to protect Norman," but come the next morning with prisoner roll-out there was the potential for Norman and Meyers to cross paths and for something to happen unless someone read the log entry and took further action.  Consequently, the reasonableness of Schwehr making the log entry in the East Cell House log and not taking other affirmative action is dependent, in part,  upon what he anticipated would happen as a result of his log entry, and he offers nothing in his affidavit as to what that might be.  There is already evidence before the court  in the form of Materi's affidavit that NDSP correctional officers are not always diligent in reading the logs when they first come on duty if Materi's account is to be believed. In addition, there appears to be no written policy regarding when and under what circumstances the logs must be reviewed.[6]   For these reasons as well, the jury could conclude that it was not enough merely to make a log entry.

Schwehr states that, in addition to making his log entry, he contacted his lieutenant and reported what Taylor had told him about the "towel incident."  Somewhat troublesome, however,

---

[6]  Pursuant to a discovery order enforcing one of Norman's discovery requests, the defendants were required to submit to the court for *in camera* inspection its written policies and procedures regarding prison logs.  The policy that was submitted makes no mention of when and under what circumstances the logs are to be reviewed.

is the lack of any detail in terms of what was actually discussed including: what level of detail Schwehr shared; how Schwehr characterized the risk at the time; whether any options for handling the matter were discussed; whether any directions were given by the lieutenant; and whether the lieutenant indicated whether he was going to take any action independent of Schwehr.  In fact, there is no independent verification that this conversation occurred either in the form of prison records (other than log entry made by Schwehr) or an affidavit from the lieutenant. At this point, the jury could choose to believe that the contact was not made or the appropriate level of the severity of the situation communicated to the lieutenant.  Cf. Newman v. Holmes, 122 F.3d at 653 (jury could conclude that prison official was not being candid given unexplained holes in the defense that included failure to explain matters that could have been explained by available evidence including prison records).

Finally, Schwehr argues that Norman has failed to demonstrate he was "consciously indifferent" to whatever risk existed given the actions that he did take.  As discussed in more detail with respect to defendant Materi, the jury is allowed to draw inferences that the requisite mental state existed from the evidence of knowledge of the substantial risk and the failure to take reasonable action.  Further, while not required to survive summary judgment, Norman has also proffered "motive" evidence of why he believes Schwehr consciously decided not to take more aggressive action despite the circumstances demanding it according to Norman.  Norman claims that Schwehr was upset with him over the fact that he had previously filed grievances against Schwehr, one of which related to a prank that Schwehr had been involved in that allegedly resulted in Schwehr being disciplined.  Norman has provided a copy of the grievance that resulted in the disciplinary action. In this case, there are sufficient facts from which a jury could infer the requisite mental state.

For all of these reasons, Schwehr is not entitled to summary judgment of dismissal at this stage with respect to Norman's Eighth Amendment claim. All this means is that a jury must now decide the merits, and the court's ruling should not be taken as an indication of the strength of Norman's case. In fact, given that Schwehr made the log entry warning of an assault, Norman will likely have an uphill battle persuading the jury that Schwehr was "consciously indifferent" to the risk that existed because, as already noted, mere negligence is not enough to prove liability and the jury will be instructed on that point.

With respect to Schwehr's claim of qualified immunity, the court has already observed that it must follow a two-step process in considering the defense, which is a question for the court and not the jury. In terms of the threshold, first-step question, the court concludes, after construing the facts most favorably for Norman, that a substantial risk of serious injury existed on an objective basis - at least as of the day prior to the assault. Further, there is sufficient evidence from which the jury could conclude that Schwehr had actual knowledge of the substantial risk, that the actions taken by him were insufficient in light of the risk that existed, and that Schwehr consciously disregarded the risk that existed by failing to take reasonable measures. In other words, the evidence is sufficient at this stage to support an Eighth Amendment claim construing the evidence most favorably for Norman.

Turning to the second step, *i.e.*, whether Schwehr's conduct violated clearly established rights of which a reasonable person would have known, the Eighth Circuit summarized the determination that must be made in a recent Eighth Amendment "failure to protect" case as follows:

> This determination is undertaken in light of the law as it existed at the time and the "specific context of the case, not as a broad general proposition." <u>Saucier v. Katz</u>, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). The Supreme Court, however, has made it clear that there need not be a case with "materially" or

35

"fundamentally" similar facts in order for a reasonable person to know that his or her conduct would violate the Constitution. Hope, 536 U.S. at 741, 122 S.Ct. 2508. The "salient question ... is whether the state of the law" gave the officials "fair warning that their alleged [conduct] was unconstitutional." Id.

Young v. Selk, 508 F.3d at 875.  The court then went on to observe that  "it was no doubt clearly established long before 2004 . . . that the eighth amendment required prison officials 'to protect prisoners from violence at the hands of other prisoners.'" Young v. Selk, 508 F.3d at 875 (quoting Farmer, 511 US. at 831).  Similarly, in Erickson v. Holloway, which the Eighth Circuit decided in 1996, the court stated:

> Before the attack on Erickson, it was clear that the Eighth Amendment requires prison officials to protect inmates from violence at the hands of other inmates. See Farmer v. Brennan, 511 U.S. 825, ----, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994). When prison officials know an inmate faces a substantial risk of serious harm from another inmate and fail to take reasonable measures to lessen the risk, the Eighth Amendment is violated. Id. at ----, 114 S.Ct. at 1984; Reece, 60 F.3d at 490.

77 F.3d at 1080.

Construing the facts most favorably for Norman, a reasonable corrections officer in the same situation as Schwehr would have realized that there existed a substantial risk of serious harm to Norman.  And, in that situation, Farmer, and the Eighth Circuit cases applying Farmer, provided fair warning that the failure to take reasonable steps to address the risk, when one has the ability to do so, would result in an Eighth Amendment violation.  In fact, Schwehr acknowledged his awareness of his responsibility when he stated in his affidavit that he would have taken other, more drastic action if he believed a definitive threat had existed.

Schwehr also argues that he took reasonable steps.  But, that is open to question, and because of the disputed facts, the court is not able to conclude that the steps taken were reasonably sufficient

as a matter of law or that a reasonable officer in Schwehr's situation would have considered them reasonably sufficient.

### 3.    Defendant Materi

Defendant Materi is in a somewhat different situation than Schwehr.  There is no evidence she was aware of the events leading up to Schwehr making the log entry.  On the other hand, she possessed information that Schwehr did not.  Also, it is undisputed that Materi took no action based on whatever knowledge the jury ultimately concludes she had.

More particularly, Norman has submitted an affidavit from "Moe" in which "Moe" claims he told Materi approximately two weeks prior to the assault upon Norman that a black inmate was looking to hire someone to beat Norman up.  Materi disputes the details of this account, but not the fact that she had a conversation with "Moe."  She claims "Moe" told her that a black inmate was going to assault Norman, not hire someone to beat him up, and that "Moe" later came back and said he was mistaken.

In his affidavit, "Moe" denies Materi's account, including that he made any retraction.  For purposes of summary judgment, the court must construe the disputed facts most favorably for Norman.   Either way, however, Materi had some knowledge of a potential for an assault approximately two weeks prior to the assault.[7]

---

[7]  Materi argues it is significant that, according to her version, "Moe" told her that a black inmate was going to beat up Norman, and not hire it done, because Meyers is white.  Even if Materi's version of what happened is correct, she was put on notice that Norman was a possible target for an assault.  And, while at the time it may have not been substantial, it arguably took on more significance with the added information that Norman was a potential target of an assault by Meyers.  There is no requirement under the Eighth Amendment that, before liability can attach, a prison official must have advance notice of the potential for an assault by the prisoner who ultimately commits the assault.  Farmer v. Brennan, 511 U.S. at 849 n.10; Brown v. Budz, 398 F.3d 904, 915 (7th Cir. 2005) (citing other cases).  Common sense suggests that are times when inmates collaborate in terms of taking retaliation against other inmates.  Consequently, the knowledge that Materi acquired two weeks earlier has some relevance to the issues of whether there was a significant risk on the morning of the assault and whether she fully appreciated that risk.

If the only information that Materi possessed was what "Moe" had told her, there may be an argument that the information was too speculative and uncertain to conclude that Materi had actual knowledge of a "substantial risk." The court need not resolve this point now, however, because there is more.

When Materi came on duty the morning of the assault, she noted in the log for the East Cell House that she had reviewed the log that contained the entry made by Schwehr the evening before warning that Meyers may assault Norman. Obviously, this was more concrete information than what had been communicated by "Moe" two weeks earlier.

In her affidavit, Materi claims that she does not typically read the log entries for the prior evening until after morning "roll-out" because the period from when she comes on duty to the completion of morning roll-out is so hectic. Materi states that she did not see the log entry warning about the possibility of an assault until after it had occurred. Materi's explanation for the 5:30 a.m. log entry suggesting that she reviewed the log at the time is that she routinely notes in the log when she comes on duty that she has read the log, but that she actually does not read it until she gets time after morning roll-out.

Materi argues the court must accept her explanation that she did not have actual knowledge of the log entry, much less knowledge of a substantial risk of serious harm, because Norman has not proved otherwise. But, in making this argument, she is confusing the mental state that ultimately must be proved by Norman with the nature and quantum of proof that would be sufficient for a jury to infer she had knowledge of a substantial risk and consciously disregarded it.

Direct evidence of what may have been in a prison official's mind is often difficult to come by and is not required. Just as in criminal cases where the ultimate burden of proof is even higher,

jurors rely upon circumstantial evidence to draw an inference that the requisite mental state existed.

The Supreme Court in Farmer made these points clear when it stated:

> Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, cf. Hall 118 (cautioning against "confusing a mental state with the proof of its existence"), and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious. Cf. LaFave & Scott § 3.7, p. 335 ("[I]f the risk is obvious, so that a reasonable man would realize it, we might well infer that [the defendant] did in fact realize it; but the inference cannot be conclusive, for we know that people are not always conscious of what reasonable people would be conscious of"). For example, if an Eighth Amendment plaintiff presents evidence showing that a substantial risk of inmate attacks was "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk."

511 U.S. at 842-843; see also Young v. Selk, 508 F.3d at 874.

In this case, the jury could conclude from Materi's 5:30 a.m. log entry  that she  read the log, including the entry warning of the assault, prior to the assault taking place, despite her claim to the contrary.   See  Newman v. Holmes, 122 F.3d 650, 653 (8th Cir. 1997) (concluding that the jury could have chosen not to believe the prison guard's testimony that he never opened the cell door of the prisoner who escaped and caused an assault when the prison log showed the prisoner had been fed minutes prior to the escape); cf. Giroux v. Somerset County, 178 F.3d 28, 33 (1st Cir. 1999) (a reasonable juror could have concluded that a shift supervisor performed his obligatory task of reviewing the cell block assignment roster at the start of his shift and from that would have been aware that a particular prisoner was being held for protective custody purposes).

As for Materi's argument that knowledge of the log entry is still not actual knowledge of a substantial risk of serious harm, the log entry was more than mere prison gossip and rumor.  It was

a warning expressed, presumably, by a trained corrections officer, and it was concrete and specific. Morever, Schwehr stated in his affidavit that he made the log entry in order "to protect Norman," implying that the log entry necessitated some action. While there is no evidence that Materi was aware of Schwehr's subjective thinking, Schwehr's statement that he made the log entry for this purpose is evidence of the degree of seriousness of risk that warrants a log entry of this kind. The court concludes that the log entry is sufficient evidence from which a jury could find that Materi had actual knowledge of a substantial risk of serious harm, particularly when considered together with the information that Materi had acquired two weeks earlier.

Materi argues that, even if she had been aware of Schwehr's log entry, there was nothing she could have reasonably done to prevent the assault because she was responsible for monitoring the roll-out in the East Cell House at the time of the assault and the assault took place in a traffic area beyond the East Cell House that was monitored by the other NDSP personnel. She also claims that she would not have alerted other NDSP personnel because the traffic officer and the other NDSP staff would have already been briefed based on the log entry.[8]

Although the record is sparse in terms of exactly what Materi's duties and responsibilities were, there is sufficient information from which reasonable jurors could conclude that there were actions that Materi could have taken that would have been within the scope of her authority. For example, the jury could conclude based on nothing more than common sense that one thing that could have been done was to keep Norman in his cell until the matter could be further investigated.

---

[8] Materi's claim that others would have read or been briefed on the log entry raises a number of questions. The first is why the other officers would have been briefed about the log entry and not Materi. Materi acknowledges she participated in a briefing prior to morning roll-out when she came on duty. Also, if the standard of practice is to review the log entries whenever the correctional officers have time, how could she be assured the other staff would have reviewed the log when she didn't? Also, it is not clear whether the traffic officer would have knowledge of the East Cell House log unless the traffic officer reviews all of the logs.

Presumably, this was something Materi could have arranged since she was responsible, along with others, for morning roll-out in the East Cell House where Norman was housed.  Another possibility would have been to move Norman to administrative segregation or ask that Meyers be locked down until the matter could be further investigated.  Schwehr acknowledged these options were available to him the evening before.[9]  Presumably, if these options were available then, they would have been available to Materi on the morning of the assault since both were case workers with responsibilities for the East Cell House.[10]

As for Materi's claim that she could rely upon others to have seen and acted upon the log entry, the jury might conclude this was unreasonable under the circumstances.  In his affidavit, Schwehr acknowledged the obvious, which is that he made the entry in the log warning of the potential for an assault by Meyers "to protect Norman." When Schwehr made the entry the evening prior to the assault, Norman was safely in his cell.  If log entries are made for this purpose, the jury could conclude that the person(s) who should have acted on the information were those who controlled Norman's or Meyer's movements, or both, the next morning upon roll-out.  At least with respect to Norman, Materi was one of those persons.

----

[9]  Schwehr discusses in his affidavit the option of placing Norman in administrative segregation or locking down the entire prison.  Presumably, if the entire prison could be locked down, then this could be limited to Meyers.

[10]  There is other evidence  from which a jury might conclude that, contrary to the claims in her affidavit, Materi's duties and responsibilities extended beyond simply being a monitor on the morning of the assault.  In her own affidavit, after stating she had no direct knowledge of any planned assaults upon Norman or threat by other inmates, she goes on to state:

> Had I had any valid information about a planned assault on Norman I would have immediately began an investigation.

Similarly, when inmate "Moe" told her about the possibility of an assault upon Norman, her response to "Moe" was not that you are reporting this to the wrong person and that you need to talk with someone else.  Rather, by her own account, she advised "Moe" she would have to report the contact and that she encouraged "Moe" to make sure it was accurate before she did so.  Both of these things suggest a broader range of responsibility.

All of this being said, the case against Materi is by no means overwhelming. As already noted, the jury may conclude that Materi is truthful when she claims that she did not review the log prior to the assault despite the log entry suggesting the contrary and that, at most, she was "guilty" of negligence, but not deliberate indifference. Further, even with the log entry, the jury could conclude that doing nothing and relying upon others was reasonable under the circumstances. Nevertheless, Norman has presented sufficient evidence at this stage to survive summary judgment with respect to his Eighth Amendment claim.

In terms of the issue of qualified immunity, the court reaches the same conclusions as with defendant Schwehr. There is sufficient evidence from which it could be concluded that an Eighth Amendment violation occurred. In terms of the second element, and construing the evidence most favorably for Norman (including, particularly, the disputed fact of whether Materi read the entries of the East Cell House log prior to the assault), a reasonable corrections officer reading the log entry warning of the assault would have concluded that a substantial risk of serious harm existed to Norman, particularly when armed with the knowledge of what had been told to Materi two weeks earlier about the threat of an assault upon Norman. In this situation, as already observed, the relevant case fairly warns that failure to take reasonable steps to address the risk constitutes an Eighth Amendment violation.

Materi argues that there were no steps she reasonably could have taken. But, as with Schwehr, this is open to question. Because of the disputed facts, the court is not able to conclude as a matter of law that Materi's failure to take action was reasonable under the circumstances or that a reasonable officer in Materi's situation would have believed that no action was possible or that taking no action was reasonable.

42

In summary, Materi is not entitled to a summary judgment of dismissal at this stage either as to the merits of Norman's Eighth Amendment claim or based upon her claim of qualified immunity.

**D.      Defendants Stromme and Coad**

There is nothing that indicates that defendants Stromme and Coad were aware of the information that had been communicated to Materi by inmate "Moe" two weeks prior to the assault or that they were aware of events that took place on the day and evening prior to the assault.  Based on the record, the only information that defendants Stromme and Coad had regarding the potential for an assault came from two sources.  The first was what Norman had communicated to them in various kites regarding Wrolstad allegedly disclosing kites made by Norman to other prisoners in hopes that they would retaliate, which included the reference in the June 28 kite to a prisoner (whom Norman would not identify), having knowledge that Norman may be beaten.  The second is what Wrolstad reported to Stromme and Coad in his response to Norman's June 28 kite.

Based on the record, the court concludes that no reasonable jury could find that either Stromme or Coad possessed the requisite "actual knowledge of a substantial risk of serious harm." What was communicated to them by Norman was more in the nature of speculation, rumor, and mere possibility, particularly when the information is considered in its proper context.

First, the allegations that Norman was making were part of a larger campaign to get Wrolstad fired. and could rightly be viewed with a healthy degree of skepticism.  Second, the information Norman complains about having been disclosed to other inmates was not information targeted against the other prisoners.  Rather, it was directed to Wrolstad's operation of the Education Department generally and the restaurant management class in particular.  At best, these complaints

had only a potential for affecting the other inmates, much less create a reason for them taking retaliation and risk punishment for the consequences.  Third, and perhaps most important, Norman never stated in the communications to Stromme and Coad that he personally feared for his safety and never once asked for protection or an investigation regarding those who might be wanting to beat him up.  In fact, he failed to make known to either Stromme or Coad the fact he possessed information that, arguably, may have been more concrete regarding Meyers and inmate "Smith".  See Burnley v. Evan, Jr., 2007 WL 2874037, *2 (8th Cir. 2007) (unpublished per curiam decision) (lack of request by a prisoner for protective action when the prisoner is aware of the alleged danger is evidence of a lack of obviousness of the risk); cf. Berry v. Sherman, 365 F.3d  at 634 (evidence that a prisoner did not express fear for his personal safety and declined protective custody was relevant as to whether there existed a substantial risk); Falls v. Nesbitt, 966 F.2d, 367, 378 (8th Cir. 1992) (same).

Moreover, Stromme and Coad did not ignore Norman's complaints.  Wrolstad was asked to respond and Wrolstad provided a written response in which he denied making Norman's kites available to other prisoners and stated that it was common knowledge among the prisoners that Norman who was complaining about the restaurant program because Norman was not keeping the fact he was complaining a secret from the other prisoners.  Wrolstad also stated that he had talked to several prisoners who were upset with Norman's complaints and told them that the matter was not worth their getting in trouble over - the implication being the matter had been dealt with.  The mere fact that, in hindsight, Stromme and Coad may have been negligent, or even grossly negligent, in not conducting a more in-depth investigation from which they *might* have gained additional

knowledge regarding the potential for a threat of assault is not enough.  See Tucker v. Evans, 276 F.3d at 1001-02.

For these reasons, Stromme and Coad are entitled to summary judgment of dismissal with respect to the merits of Norman's constitutional claims.  The court also concludes that it was objectively legally reasonable for Stromme and Coad to believe that their conduct did not violate Norman's Eighth Amendment rights and that they are entitled to qualified immunity, as well.

### E.      Defendant Bertsch

The record indicates that the only information that defendant Bertsch received prior to the assault was what Norman had sent her.  This was less than what was possessed by defendants Stromme and Coad.  Consequently, in terms of her pre-assault conduct, she is entitled to be dismissed on the same grounds as defendants Stromme and Coad.

After the assault, defendant Bertsch did consider an appeal from the denial of Norman's grievance.  For the same reasons as expressed above with respect to defendants Branson and Sullivan, there is no basis for an Eighth Amendment claim based upon her having upheld the denial of Norman's post-assault grievance.

### F.      Defendant Schuetzle

There is no indication that defendant Schuetzle had all of the information possessed by defendants Stromme or Coad about the possibility of an assault upon Norman, which the court has found to be insufficient as a matter of law as to those two defendants in terms of having actual knowledge of a substantial risk.  Also, there is nothing in the record that indicates Warden Schuetzle was personally aware of the events that occurred on the day prior to the assault or on the early morning hours of September 22, 2005, prior to the assault taking place.  The case against defendant

Schuetzle, to the extent there is one, is based on the claim that inmate Meyers was a substantial risk to other inmates, not just Norman, and that Warden Schuetzle was deliberately indifferent to that risk.

The record indicates that Meyers had five administrative convictions for assaulting other inmates within two years of the assault upon Norman and had been placed in administrative segregation several times.  As of the time of the assault upon Norman, however, he had been back in the general population for six or seven months on a "good behavior" contract after performing well in his last stint in administrative segregation.

If this was all, there may be some question whether Norman would have an Eighth Amendment claim, particularly, if it is true that Meyers had stayed out of trouble after his release back to the general population as the defendants claim.  In Farmer, the Supreme Court noted that the Eighth Amendment only requires that prison officials "ensure reasonable safety . . . , a standard that incorporates due regard for prison officials' unenviable task of keeping dangerous men in safe custody under humane conditions . . . ."  511 U.S. at 844-845.  It does not require, for example, the indefinite segregation of all inmates just because they have at some point in the past demonstrated a capability for violence.  Cf. Blades v. Schuetzle, 302 F.3d at  803-804; Curry v. Crist, 226 F.3d at 975-979.

The problem here, however, is that there are disputed facts regarding whether Meyers stayed out of trouble after he was released back to the general population on his good behavior contract. Norman has presented evidence that Meyers was involved in another incident of retaliation during this time. Specifically, there is evidence that Meyers shaved a "C" on the back of the head of a sex

46

offender while giving the prisoner a haircut and that the victim of this act requested that prison officials return Meyers to administrative segregation.

Construing the evidence most favorably for Norman, the jury could conclude that the head-shaving incident occurred, that Meyers presented a substantial risk to other inmates, and that Meyers should have been returned to administrative segregation or more closely monitored if not returned. Cf. Reece v. Groose, 60 F.3d at 491 (holding that the factfinder could conclude the prisoner had a propensity for violence, that the defendants knew of this propensity, and that exposing the victim to the prisoner was unreasonable). In terms of the latter, the jury might conclude that steps could have been implemented upon notice of the head-shaving incident, or even before when Meyers was released back to the general population, to ensure the taking of prompt protective measures in the event of a new threat of violence by Meyers. As already noted, the day prior to the assault Brian Taylor, the West Unit Case Worker, and defendant Schwehr both became aware of specific information indicating that Meyers might assault Norman. While both of these individuals took action, *i.e,* Taylor called Schwehr and Schwehr made the log entry and allegedly notified his superior, the jury could conclude that there should have been in place some notice or directive to corrections staff by those with overall responsibility for Meyers's behavior that any hint or threat of future violence by Meyers required immediate affirmative action in terms of protecting the target of the threatened assault or, perhaps more reasonably, immediately restricting Meyers's movements until the matter could be sorted out.

In terms of whether Warden Schuetzle possessed the requisite knowledge to impose liability on this theory, the jury could infer that he had actual knowledge of these matters given his

participation in the administrative grievance processes, see Nei v. Dooley, 372 F.3d at 1007, and also given his position as warden, cf. Reece v. Groose, 60 F.3d at 491.

Because of the disputed facts, Schuetzle is not entitled to summary judgment on the merits. The same is true for the defense of qualified immunity.  Construing the facts most favorably for Norman, there is evidence that supports the conclusion on an objective basis that Meyers presented a substantial risk to other inmates at the time of the assault - not just Norman.  Supreme Court and Eighth Circuit precedent have made clear in such circumstances that any conscious act or failure to act can give rise to an Eighth Amendment violation and that advance knowledge of a particular assault is not necessary.  See  Farmer, 511 U.S. at 843 ("it does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk for reasons personal to him or because all prisoners in his situation face such a risk"); Nei v. Dooley, 372 F.3d 1003, 1006-07 (8th Cir. 2004) (affirming the denial of motion for summary judgment on the issue of qualified immunity because of evidence that prison officials had knowledge of a substantial risk of harm to other inmates); Krein v. Norris, 309 F.3d at 491 (the excessive risk of harm that  to all of the other prisoners in the same barracks).

But, as with defendants Schwehr and Materi, the case against Schuetzle is by no means overwhelming.  The operation of a prison is an extremely difficult business.  This is particularly true where there are the legitimate competing concerns of, on the one hand, wanting to reward positive behavior by granting more freedoms and privileges to an inmate like Meyers because of the practical problems of keeping everyone who is a possible threat segregated indefinitely and, on the other, providing a reasonable degree of safety to the other inmates.  The fact that, in hindsight, an imperfect judgment may have been made based upon an unsound assessment of the risk is not

48

enough.  Farmer, 511 U.S. at 844.  Norman must prove conscious indifference, which may be difficult to do.

### G.      Defendant Wrolstad

Norman's claim against defendant Wrolstad is twofold.  The first is that Wrolstad deliberately gave copies of one or more of Norman's kites to other inmates, or otherwise made known to other prisoners that Norman was making complaints about the restaurant class, with the hope that they would take retaliation against Norman.  This is a serious charge since it alleges more than just recklessness.  Obviously, these allegations, if true, could support an Eighth Amendment claim for damages if Wrolstad's conduct created a substantial risk of harm and serious harm proximately resulted.  E.g., Northington v. Jackson, 973 F.2d 1518, 1525 (10th Cir. 1992) (inciting inmates to beat another inmate gives rise to an Eighth Amendment claim).

In an affidavit filed in support of the motion for summary judgment, Wrolstad denies that he gave copies of Norman's kites to other inmates and the only evidence that Norman has that he did so is an affidavit from prisoner "Doe" who claims he saw one of the kites and was told by another prisoner, inmate "Smith", that he ("Smith") obtained the kite from Wrolstad.  However, this is hearsay that is of questionable admissibility at trial.  Also, there is no firsthand evidence that Wrolstad inappropriately disclosed Norman's name.  The simple fact that prisoners may have known Norman was complaining is not enough given that Norman may have been making his complaints known to others or the prisoners being able to infer the probable identify of the person complaining based on the circumstances.

When the court questioned Norman about the hearsay problem during the most recent telephonic hearing, Norman stated he thought he had provided sufficient information, but suggested

he may be able to secure information from the party who allegedly possessed the firsthand knowledge.  Norman also stated there were other persons who would have firsthand knowledge.

Wrolstad argues that, even if was to be assumed that he supplied copies of Norman's kites to other inmates, there is a lack of proximate cause in that Norman's kites complaining about the restaurant class issues did not involve Meyers because he was not in the class.  Norman's theory, however, is that inmate Meyers assaulted Norman, at least in part, because he was doing the bidding of inmate "Smith."   And, there is firsthand evidence in the form of the affidavit from inmate "Doe" that he observed "Smith" and Meyers viewing one of Norman's kites and discussing what should be done with Norman.  While this was several months prior to the assault, it was not so far in advance that no reasonable jury could find that there was some causal link.[11]

Given the fact that Norman has been proceeding *pro se*, his lack of appreciation for the rules of evidence, and the fact that he has submitted affidavits and evidentiary material that come close to satisfying what may be required to survive summary judgment, the court will allow Norman an additional 45 days to submit affidavits setting forth firsthand knowledge regarding his claims that Wrolstad made his kites available to other prisoners or otherwise inappropriately disclosed his identity.  If Norman fails to submit specific factual information that is sufficient to withstand summary judgment or fails to show good cause why he was not able to obtain the information despite making a diligent effort, the court will rule on the motion for summary judgment with respect to defendant Wrolstad based on the record then existing.

---

[11] The record contains additional suggestions of a link, which have not been fully developed in terms of evidence that would be admissible.  For example, inmate "Moe" claims in an affidavit that he told defendant Materi that a black inmate was looking to hire someone to assault Norman and inmate "Smith" is black.  "Moe" does not identify the black inmate, however, nor does he state whether his knowledge was based on firsthand knowledge or was mere hearsay.

Norman also claims that Wrolstad had actual knowledge of a substantial risk of an assault upon him apart from whether he deliberately attempted to induce other inmates to take retaliation. The only submissible evidence of this, however, is Wrolstad's memorandum to defendant Coad that was prepared in response to Norman's June 28 kite.   In that memorandum, Wrolstad stated the following:

> I would hate to see anyone get into trouble concerning assaulting Norman.  I have told several inmates that Norman is not worth losing your housing, job, being placed in AS and to simply ignore him.  Norman has had problems in the past and will probably have problems in the future with other inmates because he simply gets into everyone's business and doesn't do his own time.

It is questionable whether this, by itself, is enough for a reasonable jury to conclude that Wrolstad had knowledge of a substantial risk of serious harm to Norman, even if the jury was to reject Wrolstad's testimony[12]

Norman makes reference to a conversation that allegedly occurred between an inmate (probably  "Olson" - a fictitious name) and Wrolstad in which Wrolstad allegedly advised "Olson" to stay away from Norman because Norman was going to get beat up.   At this point, Norman's recitation of what "Olson" purportedly told him is mere hearsay.   In addition, Norman stated during

---

[12]   In an affidavit filed in support of the defendants' motion for summary judgment, Wrolstad characterizes Norman's complaints about the restaurant class as being primarily directed at a cookout that was being sponsored by the class and how it was being funded.  Wrolstad states that when Norman began asking questions about the cookout, he had to approach the inmates who were managing the cookout to get the information he needed to be able to respond to Norman's kites.  Wrolstad claims he did this without disclosing Norman's kites or his identity, but that it was no secret among the prisoners who was complaining because Norman was freely making his complaints known to other inmates.  Wrolstad also denies having knowledge of a planned assault upon Norman, whether by Meyers or anyone else.  With regard to the warning that he claimed in his memorandum to Stromme that he gave to a group of inmates, Wrolstad states the following:

> I was present in room where a group of inmates were expressing their displeasure of Norman's attempt to cancel the cookout.  Meyers was not present.  There was no specific threats made by any in the group.  The group of inmates simply were expressing their frustration as to Norman's attempt to cancel the cookout.  I told the group that it would not be worth losing their privileges by taking any action, physical or non-physical against Norman.  The group agreed with my statement and I considered this admonition to have taken care of any potential problem.  This occurred more than two months prior to the incident between Meyers and Norman.

the most recent telephonic hearing that he told Wrolstad about inmate "Smith," but this also is not evidence the court can consider upon summary judgment since it was not given by Norman under oath, such as in the form of an affidavit. Further, more detail would be required for that information to be significant, including what specifically was told to Wrolstad and what Wrolstad's response was, if any.

Given that the court is going to allow Norman more time to supplement the record with regard to his other theory, the court will allow Norman time to submit additional information that he believes is relevant to this theory before the court makes a final ruling. The additional information, however, must be by affidavit made by a person with firsthand knowledge unless good cause is shown for why an affidavit cannot be obtained.

## IV.   CONCLUSION AND ORDER

Based on the foregoing, it is concluded and **ORDERED** as follows:

1.   Norman's motion for summary judgment (Doc. No. 83) is denied.

2.   The defendants' motion for summary judgment of dismissal (Doc. No. 60) is **GRANTED IN PART** as to defendants Stromme, Coad and Bertsch. These defendants are entitled to a judgment of dismissal of the complaint on the merits and also on the grounds that they are entitled to qualified immunity.

3.   The defendants' motion for summary judgment (Doc. No. 60) is **DENIED IN PART** as to defendants Schwehr, Materi, and Schuetzle.

4.   The court **DEFERS** ruling on the defendants' motion for summary judgment as to defendant Wrolstad. Norman shall have until March 10, 2008 to supplement the record with additional evidentiary material or he must show good cause why the

information could not be obtained by affidavit and must detail the evidence he claims

exists, including identifying the persons who possess the information.   Defendant

Wrolstad will have until April 1, 2008, to supply any additional responsive material

that may be deemed necessary and both parties may request a further hearing on the

matter.

Dated this 7th day of February, 2007.

/s/ Charles S. Miller, Jr.
Charles S. Miller, Jr.
United States Magistrate Judge