IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
SOUTHWESTERN DIVISION

| | | |
|---|---|---|
| James Norman, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **ORDER DENYING WROLSTAD'S** |
| vs. | ) | **MOTION FOR SUMMARY JUDGMENT** |
| | ) | |
| Dan Wrolstad, et. al. | ) | |
| | ) | Case No. 1:06-cv-010 |
| Defendants. | ) | |

In the February 7, 2008, order addressing the cross-motions for summary judgment, the court reserved ruling on Wrolstad's motion to allow Norman an additional opportunity to supplement the record. The court also appointed counsel for Norman. Norman has now filed additional evidentiary material to which defendant Wrolstad has had an opportunity to respond, and Wrolstad's motion is ripe for consideration.

Norman's Eighth Amendment claim against Wrolstad arises out of the September 22, 2005, assault upon him by inmate Michael Meyers. Norman's primary contention is that Wrolstad, who was the NDSP's Director of Education and who is now retired, deliberately gave copies of one or more of Norman's grievances to a black prison inmate that the court previously identified by the fictitious name of inmate "Smith" with the hope that 'Smith' would take retaliation against Norman. Norman contends that "Smith" conspired with inmate Meyers to commit the assault upon Norman.

If, in fact, defendant Wrolstad did what Norman contends with the hope that retaliation against Norman would result, there is little doubt that it would constitute an Eighth Amendment violation if Norman suffered harm as a consequence. E.g., Northington v. Jackson, 973 F.2d 1518, 1525 (10th Cir. 1992) (inciting inmates to beat another inmate gives rise to an Eighth Amendment

1

claim).  Further, it is clear that Wrolstad would not be entitled to qualified immunity based on the authority cited in the court's prior order.

At the time the court issued its initial order, the court had before it an April 25, 2007, affidavit from inmate "Doe" [a fictitious name] in which the inmate stated in relevant part:

> ["Smith"] . . . handed me the grievance that was from James Norman, and sent to Dan Wrolstad.  I read it and asked where he . . . ["Smith"] got this grievance. ["Smith"] . . .  said, "from Wrolstad." ["Smith"] . . . and Mike Meyers was going over the grievance talking so everyone in the class knew what the grievance was all about.  The grievance form was in the class between 8:00am - 11:00am..  If you wish, I can have my wife make a photocopy of my journal page with the exact date and time, and how . . . ["Smith"] and Mike Meyers talked about the grievance and what should be done to James Norman.

Later, in the affidavit, "Doe" went on to offer the following opinion:

> Also, if you go thru the kites and grievances of James Norman, you would find that Mr. Dan Wrolstad was the one to bring into play the assault Mike Meyers did to James Norman, thru . . . ["Smith"] and another inmate, which I will not mention due to security issues.

While Norman proffered other evidence, the April 25, 2007, affidavit by "Doe" came the closest to providing some evidentiary support for Norman's claims  that Wrolstad gave a copy of one or more of Norman's grievances to inmate "Smith," that inmate "Smith" and possibly others were not happy about what Norman was doing, and that inmate "Smith" had conspired with inmate Meyers with respect to Meyers taking retaliation against Norman.  And, without making any ruling, the court expressed concern in a subsequent conference with the parties about the hearsay character of that the portion of Doe's affidavit in which he claimed inmate "Smith" told him he had obtained the copy of Norman's kite from Wrolstad, particularly given that there were other ways in which

inmate "Smith" might have somehow acquired a copy of Norman's grievances that "Doe" professes "Smith" showed him.[1]

Since the court's order, Norman has proffered additional evidence to establish that Wrolstad gave copies of Norman's grievances to inmate "Smith." Prior to the court appointing counsel, Norman submitted an affidavit dated March 4, 2008, from an inmate who claims to have witnessed some of the same events described by inmate "Doe." The inmate states in relevant part the following in his affidavit:

> 3. That I was taking a computer class in 2005 in the North Dakota State Penitentiary's Education Department.
> 4. That inmate . . . . ["Smith"] came into the computer class room, as he often did, because staff allowed . . . ["Smith"] to roam around. Bryant showed inmate Michael Meyers a document that was from James Norman, and that Bryant said he got the document from Dan Wrolstad. Inmates Bryant and Meyers were talking about what the document said. I did not read the document, but I saw it. The way I saw this document was when Meyers was reading it. Meyers sat right next to me in the computer class, we sat so close, that our elbows would touch at times.
> 5. It is known that Mr. Wrolstad makes comments about one inmate to another, just to create a reaction.

While this affidavit raises the same hearsay concerns in terms of "Smith's" purported statement as to how he acquired the paperwork, this is the second witness who claims to have heard the statement. The affidavit also supports "Doe's" statement that inmate "Smith" and Meyers talked about the paperwork.

In addition, Norman has submitted two additional affidavits from inmate "Doe," one of which was submitted after Norman was appointed counsel. Inmate "Doe" professes to provide in the affidavits additional detail regarding what he saw on the day he observed inmate "Smith" with a copy of Norman's grievances. "Doe" claims that, on the day in question, he was in a computer

---

[1] The court made no ruling, however, as to the ultimate admissibility of this evidence.

3

class that was located across from another classroom where Wrolstad was at the time. He claims that he was able to see into the other classroom by virtue of big windows on both classrooms. He claims he observed inmate "Smith" enter the other classroom empty-handed and that Wrolstad was the only other person in the classroom. He claims he then observed inmate "Smith" leave the classroom after a short period of time and come over to his classroom with paperwork in his hands that he showed to "Doe," which included a couple of Norman's grievances. "Doe" then repeated much of what he said in his earlier affidavit about inmate "Smith," stating he had gotten the paperwork from Wrolstad and that inmate "Smith" then showed the paperwork to Meyers. He also attached a copy of the paperwork he claims he observed, which includes a couple of Norman's grievances about the restaurant management class along with responses made by NDSP personnel.

In addition to the foregoing, there are several other pieces of earlier submitted evidence that Norman relies upon to oppose Wrolstad's motion for summary judgment. One is an affidavit from an inmate, to whom the court assigned the fictitious name "Moe," who claims he told NDSP correctional officer Materi a couple of weeks prior to the assault upon Norman that a black inmate was looking to hire someone to assault Norman. As noted earlier, inmate "Smith" is black and at the NDSP would be in the minority of the prison population. Another is Wrolstad's own acknowledgment that there was a group of inmates who were upset with what they considered to be Norman's attempts to sabotage an inmate cookout sponsored by the restaurant management class. In addition, there is also the evidence suggesting that the assault was planned and not spontaneous as Meyers later claimed. And, there is Warden Schuetzle's response to one of Norman's kites in which he states that Wrolstad should not be showing his grievances to other inmates.

In moving for summary judgment on the merits and on the claim of qualified immunity, Wrolstad has denied that he gave copies of any of Norman's paperwork to other prisoners and states it was common knowledge among the prisoners that Norman was complaining about the restaurant management class. It appears, however, that Norman has presented enough circumstantial evidence to create a disputed issue of fact in terms of whether Wrolstad gave one or more of Norman's kites to inmate "Smith." Wrolstad's conclusory and, perhaps, also hearsay statement, that it was common knowledge in the institution among the inmates that Norman was complaining about the restaurant management class, remains to be proved.

Wrolstad has also submitted an affidavit from Meyers in which he denies seeing any of Norman's kites and denies conspiring with, or committing the assault on behalf of, inmate "Smith." He also claims, as he did at the time of his administrative conviction, that the assault was more or less spontaneous and was because of other problems that he had been having with Norman.

As noted in the court's prior order, however, there are reasons for not believing some or all of Meyers's account, including the evidence suggesting the assault was planned.[2] Also, Norman has submitted an affidavit from another prisoner who claims to have witnessed the assault and who states, essentially, that Meyers jumped Norman from behind and that the assault was unprovoked. Finally, there is also the letter that Meyers wrote to his girlfriend following the assault in which he claims that Norman took a swing at him first, but then went on to say somewhat cryptically that the "assault would have happened anyway" and that Norman "needs to stop (grievances)."

---

[2] In his affidavit, Meyers disputes that the assault was planned and gives explanations for the evidence that suggests the assault was planned. What Meyers claims may very well be the truth, but this is for the jury to decide. The court notes, however, that Meyers does not specifically address the statements he allegedly made that led to the entry on the log the night prior to the assault that Meyers may fight Norman.

Wrolstad also argues that there is a lack of evidence indicating that any knowledge on the part of the prisoners that Norman was complaining about the restaurant management class would create a risk of retaliation and that this is unlike the cases where prison officials have been found liable for disclosing that someone is a "snitch." With respect to this argument, the court agrees this case is different from disclosing that an inmate is a "snitch," but only because the danger presented by the disclosure that someone is a "snitch" is obvious, given the common knowledge that some prisoners do not like "snitches," and does not require additional proof. There may be other facts, however, that may create a danger for retaliation if disclosed, but for which additional proof is required concerning the danger because the danger is not obvious. Such may be the case here.

While the record is thin, there is evidence in the form of "Doe's" affidavit that Norman's grievances were talked about by Bryant and Meyers and that this was followed by a discussion about what should be done with Meyers. Further, as already noted, Wrolstad acknowledged in an affidavit that he filed that there were several prisoners who were upset about what they perceived to be Norman's attempts to sabotage an inmate cookout to be put on by the restaurant management class. And, while complaints about a cookout would not on their face appear to be a reasonable or rational reason for taking retaliation, we are not dealing here with a population of entirely reasonable and rational persons. Moreover, it is conceivable that prisoners may get upset about what otherwise are trivial matters, particularly those that might provide temporary respite from the boredom of prison life. Finally, Norman's principal contention is that Wrolstad acted deliberately and intentionally with the hope that retaliation will follow, which presumes some knowledge of risk or danger.

Wrolstad also argues about the lack of proof of intent. However, this also seems to be matter of disputed fact given that intent, like any other matter, can be proved circumstantially. In this case,

while it is again thin, Warden Schuetzle stated the disclosure of prisoner grievances to other prisoners is something that should not be done in his response to one of Norman's kites. The commission of a prohibited act, if proven, is evidence from which an inference could be drawn regarding the existence of the requisite intent. Cf. Haglof v. Northwest Rehabilitation, Inc., 910 F.2d 492, 494 (8th Cir. 1990). Also, Wrolstad denies that he gave copies of Norman's paperwork to other prisoners, as opposed to saying, for example, that he gave a copy out in hopes that other prisoners would persuade, in a friendly sense, Norman to back off and, perhaps also, acknowledging he may not have exercised the best of judgment. Proof that contradicts Wrolstad's denial can also be a basis for inferring an impermissible intent. Cf., MacDissi v. Valmont Industries, Inc., 856 F.2d 1054, 1059 (8th Cir. 1988).

     Finally, Wrolstad also argues that there is insufficient evidence of proximate cause. In this case, the alleged disclosure of Norman's grievances and the conversation between inmate "Smith" and Meyers appears to have occurred sometime after the middle of May of 2005 with the assault taking place on September 22, 2005. While the lapse in time certainly raises questions regarding proximate cause, along with the evidence suggesting that Meyers may have had other reasons to assault Norman, the court cannot say, based on the record presently available, that the chain of events is so attenuated that summary judgment should be granted.

     All of this being said, the issue of whether summary judgment should be granted is a very close one and the court is skeptical of Norman's claim against Wrolstad. Nevertheless, because of the material facts in dispute, the court **DENIES** Wrolstad's motion for summary judgment of dismissal on grounds of qualified immunity and on the merits at Doc. No. 60. The court, however,

will have an opportunity to revisit many of these same matters at the close of Norman's case and at the close of the evidence.

**IT IS SO ORDERED**.

Dated this 23rd day of May, 2008.

/s/ Charles S. Miller, Jr.
Charles S. Miller, Jr.
United States Magistrate Judge